DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-6747
> FAX: (415) 436-7234
> Ross.weingarten@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 18-299-04 SI |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| PATRICIA BLANCO SANCHEZ, | Sentencing Date:  September 18, 2020<br>Time:  11:00 a.m. |
| Defendant. | Judge:  Hon. Susan Illston |

### I.     INTRODUCTION

Patricia Blanco Sanchez will be sentenced by the Court on September 18, 2020 following her guilty plea to Count One of the above-captioned Superseding Information, charging her with using and maintaining a drug-involved premises, in violation of 21 U.S.C. § 856.

The government concurs with the description in the Presentence Report ("PSR") of the defendant's conduct, the Guidelines calculation, and the advisory Guidelines range. The government recommends that the Court impose a sentence that takes into consideration the seriousness of the deadly and addictive drugs that defendant stored so that they could eventually be distributed, but that also takes into consideration her particular mitigating circumstances. The government declines to make a specific sentencing recommendation in this case.

**II.     THE GOVERNMENT REQUESTS THAT THE COURT IMPOSE A SENTENCE THAT BALANCES ALL OF THE 3553(A) FACTORS**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). As the Ninth Circuit has held, Courts should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* The Sentencing Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Kimbrough*, 552 U.S. 85, 108 (2007) (quoting *United States v. Gall*, 552 U.S. 38, 49 (2007)), and are to be kept in mind "throughout the sentencing process." *Gall*, 552 U.S. at 50, n. 6.  As noted by the Ninth Circuit, the Supreme Court has "clarified that we may attach a presumption of reasonableness to sentences falling within the Guidelines range." *United States v. Saeturn*, 504 F.3d 1175, 1178 (9th Cir. 2007) (emphasis added).  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.  Here, the Sentencing Guidelines place the "starting point" and "initial benchmark" at 57-71 months.[1]

Beyond the Guidelines, under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for defendant, the Court should consider these factors, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need for the sentence imposed to protect the public from further crimes of the defendant;

(5) the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

---

[1] The defendant has a total Offense Level of 23 and a CHC of III.  Accordingly, as set forth in the PSR, her Guidelines Range is 57-71 months.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## A.  The Offense Conduct and Dangerousness of Narcotics

With respect the nature and circumstances of the offense, the defendant was part of a large organization that distributed significant quantities of highly addictive and dangerous narcotics that have wreaked havoc on this community.  On May 23, 2018, the defendant was seen by law enforcement meeting with and providing a bag to Jesus Salazar, a major narcotics trafficker with ties to Mexican cartels who was charged in a separate Indictment and sentenced to 210 months in custody for his crimes. *See* CR 18-cr-251-01 WHO.   On June 8, 2018, federal law enforcement agents executed a search warrant at the defendant's home.  Inside the defendant's bedroom closet, agents found a bag containing approximately 33 pounds of methamphetamine.  Hidden inside a tire in the defendant's garage, agents found approximately 14.6 kilograms of fentanyl.  Agents also found a pay-owe sheet in the defendant's home documenting when drugs were due to arrive at her home and who would drop them off and pick them up.  In total, the drugs found in the defendant's home have a street value of well over $100,000.[2] It seems clear, then, that the defendant's home was being used, with her knowledge, to store and hide dangerous drugs; from there, they would be sold into the community.  And while there are no identifiable victims of the defendant's drug dealing, drug distribution leads to drug abuse.  There are countless victims—not only addicts themselves, but their families and loved ones—who suffer as a result.  While the government believes the defendant had a relatively minor role in the operations of the drug trafficking operation and therefore is less culpable than some of her co-defendants, that does not change the fact that the defendant's crime no doubt facilitated drugs being put in the hands of addicts and lives being ruined.

As stated above, law enforcement found 14 kilograms of fentanyl in the defendant's home.  By now, the Court well understands that fentanyl is the most dangerous drug to afflict our community in decades.  Fentanyl typically is dosed in micrograms (millionths of a gram), see https://www.drugs.com/illicit/fentanyl.html, and can be lethal in quantities as small as 250 micrograms,

---

[2] The DEA estimates this amount of narcotics has a street value of approximately $185,000.

or 0.00025 grams, see https://www.harmreductionohio.org/how-much-fentanyl-will-kill-you-2/ ("HRO") (noting that, before an average surgery, anesthesiologists will administer a total of just 50 mcg [0.00005 g] of fentanyl) (last visited September 10, 2020).  A dose of 2,000 micrograms – just 2 milligrams (0.002 g) – is usually fatal to those without opioid tolerance.  Id.  To appreciate just how little fentanyl that is, DEA prepared a photo showing what 2 milligrams looks like:



The equivalent of just a few grains of salt is enough fentanyl to be deadly.  It is easy to understand how a drug so lethal has become the "Third Wave" of the drug overdose crisis that has gripped this nation for the past two decades and now claims between 65,000 and 70,000 lives each year.  See Hedegaard, H., et al, "Drug Overdose Deaths in the United States, 1999-2018," at https://www.cdc.gov/nchs/data/ databriefs/db356-h.pdf (67,367 deaths in 2018, the most recent year with complete data) (last visited June 17, 2020).  Fentanyl alone accounted for almost half of those deaths.  See "Drug and Opioid-Involved Overdose Deaths – United States, 2017-2018," in Morbidity & Mortality Weekly Report (Mar. 20, 2020) at https://www.cdc.gov/mmwr/ volumes/69/wr/mm6911a4.htm ("MMWR II") (last visited June 17, 2020).  Just a few years ago, fentanyl accounted for a fraction of the deaths it claims today:  in 2014, the overdose death rate from fentanyl was just 1.0 per 100,000 persons, see "Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014," in Morbidity & Mortality Weekly Report (Jan. 1, 2016) at https://www.cdc.gov/ mmwr/preview/mmwrhtml/mm6450a3.htm ("MMWR I") (last visited June 17, 2020); in 2018, the overdose death rate from fentanyl had climbed to 9.9 per 100,000, see MMWR II.  Indeed, while the overdose death rates due to other opioids remained stable or decreased slightly between 2017 and 2018, the death rate from fentanyl increased 10%.  MMWR II.

       In the Bay Area, fentanyl overdose deaths are skyrocketing.  In San Francisco alone, more than

half of the 441 overdose deaths in the city last year were due to fentanyl, and that number is expected to rise even more in 2020.  See https://www.sfchronicle.com/politics/article/More-than-one-person-a-day-died-in-SF-of-an-15529006.php (last visited Sept. 11, 2020).  And because fentanyl is a powder, and so potent, it is finding its way into other drugs – including methamphetamine and cocaine, counterfeit pills, and as a cut to increase the potency of weak heroin – and killing those who never suspected they were ingesting fentanyl.

An opioid overdose death – including death from fentanyl – is tragic and awful.  Opioids, like fentanyl, depress respiration, resulting in slower, shallower breathing.  The body fights against the lack of oxygen and buildup of carbon dioxide, often resulting in rattling gasps as a frothy fluid begins to fill the lungs and airways.  Eventually, the victim's organs begin to fail from lack of oxygen, and then his heart stops.  There is nothing about this process, which can occur in minutes or take up to half an hour, that can be called peaceful.

There is an "antidote" to opioid overdoses – naloxone – which temporarily displaces the opioids from the opioid receptors in the brain and elsewhere and thereby reverses the opioids' effects on the body.  But fentanyl acts so quickly and is so strong, that first responders often cannot arrive soon enough to revive someone who has overdosed on fentanyl.  Even if they arrive in time, reviving someone from a fentanyl overdose may take many doses of naloxone – more than they carry.

The defendant stored this lethal poison so that it could be distributed in our community.  By her actions, she increased the chances that one of the customers of Jesus Salazar's narcotics trafficking organization, one of its customers' customers, or an unsuspecting person who came into contact with those customers' drugs, would die.  Any dose she stored could have been sold and become the last for someone.  Even if fentanyl doesn't cause death, it feeds addictions and drug dealers profit from its use.

And while the opiate crisis in general, and fentanyl in particular, has consumed front-page headlines with its devastating impact on the nation, methamphetamine abuse is also a significant problem in the Bay Area. On February 8, 2019, the San Francisco Chronicle published an article entitled, "Meth deaths and ER visits climb sharply in SF, as leaders look for solutions, written by Erin Allday. *See* https://www.sfchronicle.com/health/article/Meth-deaths-and-ER-visits-climb-sharply-in-SF-as-13599681.php. The articles details that methamphetamine overdoses "doubled over the past decade"

1  and that there about "100 people died from methamphetamine overdoses in 2017, compared with about

2  150 from all types of opioids[.]" *Id.* "Long-term [methamphetamine] use can cause brain damage.

3  People who overdose can become combative and unpredictable, and they may feel urges to harm

4  themselves or others. Overdose deaths happen when methamphetamine causes sudden heart failure or

5  bleeding of the brain's main blood vessels." *Id.*; *see also* "Meth's Comeback: A New Speed Epidemic

6  Takes Its Toll on San Francisco," *available at* https://www.kqed.org/news/11724407/meths-comeback-

7  a-new-speed-epidemic-takes-its-toll-on-san-francisco ("Since 2011, emergency room visits related to

8  meth have jumped 600 percent to 1,965 visits. Admissions to the hospital are up 400 percent to 193. At

9  Zuckerberg San Francisco General Hospital, of 7,000 annual psychiatric emergency visits, 47 percent

10  are people who are not necessarily mentally ill — they're high on meth.").  By storing large quantities of

11  methamphetamine, the defendant contributed to and exacerbated the destruction in our community

12  caused by methamphetamine.

13  ## B.  The Defendant's History and Characteristics

14  With respect to the defendant's history and characteristics, the goal of deterring future criminal

15  conduct, and the need to promote respect for the law: This is defendant's first conviction for a drug-

16  related offense.  She was, however, on probation when she committed this offense after being convicted

17  of assaulting her former husband with both a closed fist and also hitting him with her vehicle while it

18  was going 20-30 miles per hour.

19  The government acknowledges the defendant's challenging family background and the trauma

20  that she has endured, including years of domestic violence by multiple husbands.  In addition, the

21  government notes that the defendant has cared for her three children, including one with substance abuse

22  and mental health challenges.  The government also acknowledges that the defendant has suffered from

23  significant mental health issues herself, as detailed in the PSR.  The government believes the Court

24  should take these factors into account when crafting the defendant's sentence.

25  //

26  //

27  //

28  //

GOVT. SENT. MEM.                    6
CR 18-299-04 SI

## III.     CONCLUSION

The government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

DATED:  September 11, 2020                                     Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
ROSS WEINGARTEN
Assistant United States Attorney